## Abbotts Dairies, Inc., et al. v. City of Philadelphia et al.

*Sterling, Stern & Levy* and *Duane, Morris & Heckscher*, for plaintiffs.

*Abraham L. Freedman*, City Solicitor, and *Abraham Wernick*, Deputy City Solicitor, for defendants.

LEWIS, P. J., and CARROLL, J., July 9, 1953.—In these equity proceedings brought by plaintiffs against the City of Philadelphia we are required to determine whether payments of fees to the respective State agencies regulating wineries and ice cream manufacturers exempt such enterprises from the provisions of the Philadelphia Mercantile License Tax Ordinance adopted December 9, 1952. The facts having been agreed upon by stipulation of all parties, the sole question before us is whether as a matter of law these fees bar the city from taxing complainants.

The first bill is brought by Wilen Brothers, Inc., a Pennsylvania corporation engaged as a liquor importer and a winery; the second bill by the ice cream manufacturers of Philadelphia, including Abbotts Dairies, Inc., Borden's Ice Cream Company, Breyer Ice Cream Company, Penn Dairies, Inc., Philadelphia Dairy Products, Inc., Penn Ice Cream Co., Quaker Ice Cream Company and Supplee-Wills-Jones Milk Company. Corporate plaintiffs contend that they are exempt from the tax because of corporate levies paid to the State. That contention must be dismissed under the mandate of the Supreme Court expressed in National Biscuit Company et al. v. City of Philadelphia, 374 Pa. 604, decided June 26, 1953.

In addition to the corporate tax paid to the Commonwealth, Wilen Brothers and the ice cream companies pay certain fees to the Pennsylvania Liquor Control Board and the Department of Agriculture, respectively, which raise the issue of whether these payments are "license fees" within the intendment of the Sterling Act of August 5, 1932, P. L. 45, since if they are, the Commonwealth has preëmpted the field and the city may not therefore levy any tax. Plaintiffs contend that the payments constitute such fees,

whereas the city argues that the sums paid to the agencies regulating these companies are merely "registration fees" and hence do not exempt the companies from the provisions of the ordinance.

An examination of the statutes under which wineries and ice cream companies are regulated by the Commonwealth as well as an analysis of the charges imposed upon them by the respective agencies lead us to the conclusion that the complainants before us pay real license fees within the meaning of that term in the Sterling Act and in our appellate court decisions. Accordingly we hold that plaintiffs here involved are not subject to any of the provisions of the city tax ordinance nor to any of the regulations promulgated thereunder.

I. The dairy companies are engaged in manufacturing and selling ice cream and are subject to the Milk Control Act of April 28, 1937, P. L. 417, the Ice Cream Law of May 20, 1949, P. L. 1594, and to the charges imposed by the Department of Agriculture under authority of these acts. In the case of Pittsburgh Milk Company v. Pittsburgh et al., 360 Pa. 360 (1948), the Supreme Court held that milk dealers were exempt from the Pittsburgh mercantile license tax because the fees paid by the companies to the Department of Agriculture were license fees imposed by the State to defray the cost of regulating the milk industry.

The city has acquiesced in this opinion and has exempted milk dealers from the tax, but contends that ice cream manufacturers are in a different category. This conclusion is based upon the erroneous premise that the Ice Cream Law superseded the Milk Control Law with the result that ice cream dealers are not subject to the fees imposed by the latter act. Such is not the case. The Milk Control Law, sec. 412, provides as follows: "The license required by the Act shall be

in addition to any other licenses which are *now* or may *hereafter* be required by law."

It is significant that the Ice Cream Law of 1949, supra, is not a new law but in substance is a reënactment of the prior Ice Cream Law of May 31, 1933, P. L. 1116, which was in effect in 1937, when the Milk Control Act was passed. The provisions of the latter act make it clear that the licenses required by it were to be in addition to those required by the 1933 Statute and nothing in the 1949 Act indicates that the legislature intended to alter the requirement that ice cream manufacturers be subject to regulation under both laws.

Indeed, the provisions of the Milk Control Law itself indicate in unambiguous language that ice cream manufacturers are intended to be within the system of regulation and charges imposed by that act. "Milk" is defined by the law to include "fluid milk and cream, fresh, sour or storage, skim milk, flavored milk or milk drink, buttermilk, *ice cream mix*, and condensed or concentrated whole or skim milk, except when contained in hermetically sealed cans."

"Milk dealers" and "handlers" are defined in the law as follows:

"Any person . . . who purchases or receives or handles on consignment or otherwise milk within the Commonwealth for sale, shipment, storage, process or manufacture within or without the Commonwealth . . .". Article 1, Section 103 Milk Control Law. The Act also states: "A milk dealer or handler, as defined in this Act, shall not buy or handle milk, . . . or manufacture, process, handle, sell or distribute milk within this Commonwealth, unless such dealer or handler be duly licensed as herein provided. . . ."

This language of the act in defining "handlers", "dealers" and the word "milk", and fixing the license requirements contemplates complainants here involved

as the subject of supervision. The license fees are graduated from $1 to $5,000, the rate depending upon the total average quantity of milk received, produced or bought within the Commonwealth during the calendar year preceding the year for which the license is issued: Section 408.

In accordance with the recited provisions, complainants pay license fees to the Milk Control Commission part of which is allocable to regulation of fluid milk and part of which is allocable to ice cream manufacturing. The fees allocable to ice cream regulation costs alone range from $10 for Potts Ice Cream Company and Quaker Ice Cream Company to $1,500 for Breyer's Ice Cream Company. The fee is prorated in accordance with a formula set forth in the act, which levies an assessment in proportion to production, and thus the charge made bears a direct relation to the cost of regulation.

In addition to the licensing requirements and fees paid under the Milk Control Law the ice cream manufacturers are also required to secure licenses under the Ice Cream Law of May 20, 1949, P. L. 1594. The fee is a graduated one ranging from $10 to $100, depending upon the gallonage of ice cream produced in each plant: Section 6 of the Ice Cream Law. Both the title and body of that act clearly establish that the act is a regulatory measure "for the protection of the public health and to prevent fraud and deception in the manufacture, sale . . . of adulterated and deleterious ice cream, etc." (part of the title of the statute).

Detailed procedures and regulations are set forth and failure to comply gives the Department of Agriculture authority to revoke any company's license to manufacture ice cream: Section 7. It also charges the department with the enforcement of the act (section 8) and provides penalties for violation: Section 9.

Complainants here involved all pay the maximum fee of $100, with the exception of Quaker Ice Cream, which pays $50. Thus the two acts impose a system of regulation and assessment that fall within the limitation of the city's taxing power contained in the Sterling Act.[1] The charges are not merely for registration certificates. There is comprehensive supervision of the industries as well as levies upon the companies that bear a direct relation to the cost of administering the law. Indeed, even if the Ice Cream Law superseded the Milk Control Law, fees paid under the Ice Cream Act are such as constitute real license fees.

II. Wilen Brothers, Inc., is engaged in business solely as a liquor manufacturer and winery. These operations include the importation of wines which it stores, blends, packages and then sells to retail vendors. It operates under the authority of the Liquor Code of April 12, 1951, P. L. 90, which provides for a comprehensive system of supervision and regulation of this business by the Pennsylvania Liquor Control Board.[2] Numerous regulations have been promulgated by the board that control practically every aspect of the business by virtue of the broad and sweeping con-

---

[1] In Commonwealth v. Snee, Quarter Sessions Court of Washington County, March sessions, 1951, no. 59, the lower court held that as to those companies solely engaged in ice cream manufacture the Ice Cream Law of 1949 superseded the Milk Control Law, but an analysis of the statutes involved leads us to the opposite conclusion. However, as noted in the opinion, since the fees charged under the Ice Cream Law of 1949 are real license fees our conclusion would not be altered though these were the sole charges paid by the companies.

[2] Complainant is also subject to the provisions of the Spirituous and Vinous Act of December 5, 1933, P. L. 38. This act provides that at a fixed rate of .005 per unit of proof per wine gallon a tax shall be imposed which will be measured by the amount of such wines so produced, manufactured or compounded by a manufacturer or sold or used in the Commonwealth. However, since certain provisions of that act resulted in complainant's exemption from taxation at the time the suit was filed, we need not consider those provisions for the purposes of this case.

trol of the liquor industry authorized by the legislature.

The Liquor Control Act requires the Wilen Company to pay $250 a year for a winery license and $100 a year for an importer's license to the Liquor Control Board. That these are true license fees under the rationale of the Supreme Court as set forth in the case of National Biscuit Company et al. v. City of Philadelphia, supra, cannot be controverted. Any argument that might be made that such fees are mere registration fees is refuted not only by the amount of the sums paid and the regulation which is entailed but by the additional fact that a $10 filing fee is required both in applying for the winery license and for the liquor importer's license. It is these small charges which are the amounts that cover clerical and other costs of registration. Similarity to the cases of the investment brokers is also to be noted here in that these liquor dealers are compelled to pay in addition to their own license fees of $350 the sum of $10 for each salesman employed by them and this sum comes to $90 in toto. What the court said in the National Biscuit Company case is applicable here in that the amount of regulation and examination of business required is in proportion to the number of salesmen employed, and in that sense fees required for salesmen can be called commensurate with the supervision, thereby qualifying as a true license fee.

Thus, the aggregate of all these charges, which are substantial in amount and bear a direct relation to the amount of supervision exercised over the wineries by the Liquor Control Board, constitute real license fees within the meaning of the Sterling Act. In accordance with the views expressed herein we hold that complainants are exempt from the provisions of the Philadelphia tax, and we enter the following order:

1. It is ordered, adjudged and decreed that the City of Philadelphia is hereby enjoined from enforcing any

and all of the provisions of the Philadelphia Mercantile License Tax Ordinance enacted December 9, 1952, against any of the herein enumerated complainants: Abbotts Dairies, Inc., Borden's Ice Cream Company, division of the Borden Company; Breyer Ice Cream Company; Penn Dairies, Inc.; Philadelphia Dairy Products Company, Inc.; Potts Ice Cream Co.; Quaker Ice Cream Co.; Supplee-Wills-Jones Milk Company and Wilen Brothers, Inc. Costs of these proceedings are to be paid by defendant.